## CIRCUIT COURT OF THE CITY OF RICHMOND

C. Sidney King et al.

v.

Virginia Birth-Related
Neurological Injury
Compensation Program et al.

November 9, 1990

Case No. HA-726-4

By JUDGE RANDALL G. JOHNSON

This is an action by twenty-nine physicians, all licensed to practice in Virginia, challenging the constitutionality of the Virginia Birth-Related Neurological Injury Compensation Act, Va. Code § 38.2-5000 *et seq.* (the "Act"). Defendants are the Virginia Birth-Related Neurological Injury Compensation Program (the "Program"); the Virginia Birth-Related Neurological Injury Compensation Board (the "Board"); and the State Corporation Commission ("SCC"). Both the Program and the Board were created by, and exist only to further the purposes of, the Act. The case is presently before the court on the Program's and the Board's demurrer, SCC's motion to dismiss, and plaintiff's motion for summary judgment.

The Act provides the exclusive remedy for infants, their personal representatives, parents, dependents, and next of kin arising out of or related to medical malpractice claims for "birth-related neurological injuries" against

"participating" physicians and hospitals.[1] A "participating physician" is a physician licensed in Virginia to practice medicine, who practices obstetrics or performs obstetrical services either full or part time, and who elects to be a participating physician under the Act.[2] No person having a claim of medical malpractice against a participating physician on account of a birth-related neurological injury can maintain any action against that participating physician, at common law or otherwise, other than as provided for in the Act, except where there is clear and convincing evidence that a participating physician willfully or intentionally caused such injury. Claims and awards under the Act are handled in much the same way as claims under the Workers' Compensation Act, Va. Code § 65.1-1 *et seq.* In fact, it is the Industrial Commission which hears and decides such claims.

Each participating physician is required to pay an annual assessment of $5,000.00 to the Program. In addition, all licensed physicians practicing in Virginia, other than participating physicians, and whether or not they are obstetricians or perform obstetrical services, are required to pay into the Program an annual assessment of $250.00 each. It is this latter assessment which the plaintiffs in the case at bar, all of whom are physicians

[1] Section 38.2-5001 of the Act defines "birth-related neurological injury" as follows: " 'Birth-related neurological injury' means injury to the brain or spinal cord of an infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation in the immediate post-delivery period in a hospital which renders the infant permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled. In order to constitute a 'birth-related neurological injury' within the meaning of this chapter, such disability shall cause the infant to be permanently in need of assistance in all activities of daily living. This definition shall apply to live births only and shall not include disability or death caused by genetic or congenital abnormality, degenerative neurological disease, or maternal substance abuse."

[2] The Act also defines as participating physicians certain licensed midwives. That portion of the Act, however, has no bearing on this case. The same is true with regard to the Act's definition of "participating hospitals."

who are not engaged in the practice of obstetrics, challenge as being unconstitutional.

Plaintiffs' bill of complaint contains three counts, Count I alleges that the $250.00 annual assessment imposed upon nonparticipating physicians violates the due process clauses of the federal and state constitutions, as well as the equal protection clause of the federal constitution. Count II alleges that the $250.00 assessment violates Article IV, §§ 14 and 15, of the Virginia Constitution, in that the assessment upon nonparticipating physicians constitutes special legislation which grants a special right or privilege to obstetricians.[3] Count III alleges that the Act improperly delegates to the State Corporation Commission the power to tax since § 38.2-5017 of the Act requires that the "Plan of Operation" provided for by the Act be submitted by the Board to the SCC for approval or, if no acceptable plan is submitted, gives the SCC the authority to promulgate the Plan of Operation itself; and since the assessments imposed upon nonparticipating physicians are a part of the Plan. Before discussing each of these allegations individually, a few general comments are appropriate.

First, with regard to plaintiffs' claims involving due process, equal protection, and special legislation, those matters were the subject of extensive analyses and holdings in *Etheridge v. Medical Center Hospital*, 237 Va. 87, 376 S.E.2d 525 (1989). In that case, the Supreme Court held that the "cap" on monetary recoveries in medical malpractice cases against health care providers was a legitimate and constitutionally permitted legislative response to the threat that health care providers would be unable to obtain affordable medical malpractice insurance. Thus, to the extent that plaintiffs question the existence of a "malpractice insurance crisis," or the legality of the General Assembly's responding to that crisis by enacting legislation giving physicians and their insurers benefits which other tortfeasors and their insurers

---

[3] Actually, the bill of complaint only mentions Section 14 of Article IV of the state constitution. Plaintiffs' allegations pertaining to Section 15 were made for the first time in response to defendants' demurrer. The court will nevertheless address those allegations in this opinion.

do not enjoy, those questions have already been answered, and this court is bound by those answers.

Second, the bill of complaint in this case does not seek to invalidate the Act as a whole. All that is challenged is the requirement that nonparticipating doctors must help to fund it. Indeed, it is doubtful that anyone other than a potential plaintiff in a civil medical malpractice action against a participating physician or hospital would have standing to challenge the general protection afforded such physician or hospital under the Act.

Third, while plaintiffs seek to bring this action as a class action, there is no provision in Virginia law which allows class actions in cases such as this. The court treats this case, then, as being brought by twenty-nine individual physicians on their own behalves only. With the foregoing in mind, I now turn to the allegations presented.

### 1. *Due Process*

As the Supreme Court pointed out in *Etheridge*, the test to be applied in determining whether there is a deprivation of substantive due process varies depending on whether a "fundamental right" is involved.[4] Where fundamental rights are affected, the constitutionality of the enactment will be judged according to a "strict scrutiny" test; that is, the law must be necessary to promote a compelling or overriding governmental interest. *Etheridge, supra*, 237 Va. at 97. Those interests which have been recognized as "fundamental" include the right to free speech, the right to vote, the right to interstate travel, the right to fairness in the criminal process, the right to marry, and the right to fairness in procedures concerning governmental deprivation of life, liberty, or property. *Id.* at 98.

On the other hand, where legislation does not affect a fundamental right, substantive due process is satisfied if the legislation has a "reasonable relation to a proper purpose and [is] neither arbitrary nor discriminatory." *Eth-*

---

[4] Plaintiffs make no claim that any procedural due process rights have been violated.

*eridge,* at 97 (*quoting Duke v. County of Pulaski,* 219 Va. 428, 437-38, 247 S.E.2d 824, 829 (1978)). The court agrees with defendants that the practice of medicine is not a fundamental right. *See, e.g., Gross v. University of Tennessee,* 620 F.2d 109, 110 (6th Cir. 1980). Accordingly, the assessment must be judged under the lesser standard.

In attempting to show that the $250.00 assessment does not meet the requirements of due process, plaintiffs do not challenge the "reasonable relation" aspect of the test. Indeed, in light of the Supreme Court's discussion and recognition in *Etheridge* of the General Assembly's response to the medical malpractice crisis in the Commonwealth, it would be futile to make such a challenge here. Instead, plaintiffs assert that even if the General Assembly had a proper purpose in assuring that medical malpractice insurance is available to obstetricians and those rendering obstetrical care, the method chosen by the legislature to raise the necessary revenues "is clearly arbitrary and discriminatory." Plaintiffs' Memorandum at 15. First, according to plaintiffs, it is "clearly arbitrary" for the legislature to single out physicians to carry the financial burden of what the General Assembly considered to be a problem which affected the public as a whole, and obstetricians in particular. Second, plaintiffs state that the assessment is arbitrary because "three classes of physicians," as well as other health care providers generally, do not have to contribute to the Program.[5] These arguments are without merit.

With regard to singling out physicians, this court does not see how such action can be deemed arbitrary or discriminatory.[6] It must be remembered that it was a crisis involving the threatened unavailability of medical malpractice insurance which led to the enactment of § 38.2-5000 *et seq.,* including the $250.00 assessment now complained of. Physicians need malpractice insurance. The general

[5] Section 38.2-5020(D) exempts from the contribution requirement certain physicians employed by the Commonwealth, physicians enrolled in a full-time graduate medical education program, and retired physicians.

[6] As noted earlier, hospitals also contribute to the fund. That fact, however, does not affect plaintiff's argument or the court's decision.

public does not. Who better to fund the vehicle allowing physicians to acquire affordable malpractice insurance than physicians themselves? While the general public obviously benefits from doctors being able to obtain insurance, and while many valid and logical arguments can be made in favor of a wide variety of other ways in which to fund the Program, those simply are not the issues here. The *only* issues in determining whether the $250.00 assessment violates the guarantee of substantive due process are (1) whether it is reasonably related to a proper purpose; and (2) whether it is *arbitrary* or *discriminatory*. I find that the assessment passes muster on each account.

As already stated, there can be no question that the General Assembly perceived a crisis in the availability of affordable medical malpractice insurance. Obviously, if one class of potential plaintiffs in medical malpractice cases is precluded from filing civil lawsuits, the potential liability of some doctors and hospitals is reduced. Since it is reasonable to assume that a reduction in potential liability will result in lower insurance premiums, there is a reasonable relation between the Program and the proper purpose of assuring that affordable medical malpractice insurance is available in the Commonwealth. And since the Program must be funded, that reasonable relation extends to the $250.00 assessment. It should also be noted, although it is not argued by plaintiffs, that the "reasonable relation" requirement does not mean that the legislation must accomplish the results which the legislature intends. All that is required is that it be reasonably related to a proper legislative purpose, even though hindsight might prove it did not work.

In addition, the court rejects plaintiffs' argument that the assessment is arbitrary or discriminatory. Since the purpose of the General Assembly in establishing the Program was to make affordable malpractice insurance available to physicians, there is nothing arbitrary or discriminatory about making physicians fund the Program. Nor does the fact that some physicians are excluded render the assessment arbitrary or discriminatory. Physicians employed by the Commonwealth normally enjoy the state's sovereign immunity. There is no need for further protection under the Act. Students and retired physicians also need no

protection since they normally perform no services which might lead to liability for malpractice.

Finally, the fact that other health care providers do not have to contribute to the Program is not arbitrary or discriminatory. The malpractice insurance policies for those providers are not the same as for physicians, nor, the court assumes, are the premiums. Those providers are different from doctors. The fact that they are treated differently is not arbitrary or discriminatory.

## 2. *Equal Protection*

Plaintiffs' equal protection argument is based on the fact that plaintiffs are forced to contribute to a fund which provides no direct benefit to them; that is, that since they are not obstetricians and perform no obstetrical services, they are being required to "subsidize" those physicians who are covered under the Act. This argument also falls under *Etheridge.*

To withstand an equal protection challenge, a classification that neither infringes upon a fundamental right nor creates a "suspect class" must only satisfy the "rational basis" test. *Etheridge*, 237 Va. at 103.[7] Since the court has already held that the $250.00 assessment does not affect any fundamental rights, and since no suspect class or class based on gender or illegitimacy is involved, it is the "rational basis" test which must be applied here.

*Etheridge* teaches that the "rational basis" test is satisfied if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose. 237 Va. 87. Consequently, a classification will not be ruled unconstitutional merely because it causes some inequality or some discrimination. *Id.* In fact, a statutory discrimination will not be set aside if *any* state of facts reasonably may be conceived

---

[7] "Suspect" classifications are those based on race or national origin. Id., at 103, n. 7. Such classifications must pass "strict scrutiny."

Classifications based on gender or illegitimacy are subject to a level of scrutiny between "strict scrutiny" and the "rational basis" test. Id.

to justify it. *Id*. The $250.00 assessment upon non-obstetricians easily passes that test.

It must be remembered that it was the General Assembly's purpose to make affordable medical malpractice insurance available to *all* health care providers. It is entirely reasonable that in attempting to accomplish that purpose, the legislature believed that precluding persons who incur birth-related neurological injuries from suing their obstetricians and hospitals would cause malpractice underwriters to lower premiums not just for obstetricians and hospitals performing obstetrical services, but for *all* physicians. It is just as "conceivable" that the legislature concluded that health care providers other than physicians would not benefit. Thus, only physicians are asked to contribute. Again, the question is not whether the legislature was correct in its conclusions, or even whether the facts justifying the legislature's action ever existed. The only question is whether "*any* state of facts *reasonably may be conceived*" to justify the legislature's action. Such facts can easily be conceived here.

### 3. *Special Legislation*

Little need be said about plaintiffs' challenge to the assessment as being special legislation. The same challenge was made and rejected in *Etheridge*. *See* 237 Va. at 101-103. If there is a difference in this case, it is that while the "cap" applies to *all* health care providers and to *all* medical malpractice plaintiffs, the assessment at issue here is for a program in which only obstetricians and others performing obstetrical services may participate. As *Etheridge* points out, however, "[l]aws may be made to apply to a class only, and that class may be in point of fact a small one, provided the classification itself be a reasonable and not an arbitrary one, and the law be made to apply to all of the persons belonging to the class without distinction." 237 Va. at 102 (*quoting Ex parte Settle*, 114 Va. 715, 718-19, 77 S.E. 496, 497 (1913)). There is nothing any more arbitrary about a class of obstetricians and persons performing obstetrical services than there is about a class of physicians.

Moreover, as is true in the case of challenges on equal protection grounds, a classification survives a "special laws" constitutional challenge "[i]f any state of facts can be reasonably conceived [ ] to sustain it . . . ." *Etheridge*, 237 Va. at 102. Having already held that a state of facts can very easily and reasonably be conceived to justify the legislature's action here, plaintiffs' "special laws" challenge must also fail.

### 4. *Improper Delegation of Power to the SCC*

Plaintiffs' final challenge to the $250.00 assessment is that the General Assembly has improperly delegated to the SCC the power to tax. This challenge misconstrues the provisions of the Act.

Section 38.2-5020(D) provides:

All licensed physicians practicing in the Common-wealth on September 30 of a particular year, other than participating physicians, shall pay to the Program an annual assessment of $250.00 for the following year, in the manner required by the plan of operation.

Because the Plan of Operation for the Program must be approved by the SCC and because the above-quoted section allows the assessment to be paid "in the manner required by the plan of operation," plaintiffs argue that the General Assembly has delegated to the SCC the power to tax. This is simply not the case.

The only power granted to the SCC is the power to approve the Plan of Operation prepared by the Board or, if no such plan is submitted, to adopt a plan itself. The assessment, and the amount of it, have already been set by the legislature. Even if the SCC wanted to exempt some physicians from paying the assessment, or if it wanted to assess a larger or smaller fee, *it cannot do so*. It has only the power to decide, normally by way of approving the plan submitted to it, how the payment will be made; that is, the date on which the assessment must be paid, the office to which it is to be paid, and so on. It has no power to set the amount of the assessment, or to decide how the money collected will be spent. These matters have

already been properly determined by the General Assembly. Thus, there is no illegal delegation of taxing power.

### 5. SCC's Motion to Dismiss and Plaintiffs' Motion for Summary Judgment

In light of the court's findings as set out above, there is no need to address separately the SCC's motion to dismiss. Obviously, plaintiffs' motion for summary judgment is denied.

### 6. Conclusion

For the reasons stated above, the demurrer filed by the Program and the Board will be sustained, and the action will be dismissed.